IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

BONNIE D. STARNES                                                PLAINTIFF

            v.                      Civil No. 07-2113

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                   DEFENDANT

## MEMORANDUM OPINION

        Plaintiff, Bonnie Starnes, brings this action under 42 U.S.C. § 405(g), seeking judicial

review of a decision of the Commissioner of Social Security Administration (Commissioner)

denying her claims for period of disability, disability insurance benefits (DIB), and supplemental

security income ("SSI") pursuant to Titles II and XIV of the Social Security Act (hereinafter "the

Act"), 42 U.S.C. §§ 416(i) and 423.  In this judicial review, the court must determine whether

there is substantial evidence in the administrative record to support the Commissioner's decision.

*See* 42 U.S.C. § 405(g).

## Procedural Background

        The plaintiff protectively filed her applications for DIB and SSI on July 9, 2002, alleging

an onset date of August 1, 2001, due to asthma and morbid obesity.  (Tr. 114-116, 131, 303-310).

An administrative hearing was held on August 20, 2003, and an unfavorable decision followed.

(Tr. 23-80, 94-106).   On July 23, 2005, the case was remanded by the Court for further

administrative review.   (Tr. 383-393).   On July 11, 2005, the Appeals Council vacated the

January 2004 decision rendered by the ALJ and remanded the care for further administrative

proceedings.  (Tr. 394-396).  A second administrative hearing was held on October 25, 2005.

(Tr. 376-382, 513-545).  Plaintiff was present and represented by counsel.

At the time of the second administrative hearing, plaintiff was 44 years old and possessed the equivalent of a high school education. (Tr. 28, 115, 303). The record reveals that she had past relevant work experience ("PRW") as a custodian. (Tr. 29-30, 137, 140-159, 168).

On October 27, 2006, the Administrative Law Judge ("ALJ") determined that plaintiff suffered from a combination of severe impairments, but did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4. (Tr. 366, 373). He found that plaintiff maintained the RFC to perform sedentary work limited by her inability to work around fumes, dust, odors, gases, and airborne pollutants. (Tr. 366, 372). With the assistance of a vocational expert, the ALJ determined that plaintiff could perform work in electronics, cosmetics, and the watch and clock industry as a mounter, polisher, or adjuster. (Tr. 374).

The plaintiff appealed this decision to the Appeals Council, but her request for review was denied on September 6, 2007. (Tr. 318). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 7, 9).

**<u>Applicable Law</u>**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the

Commissioner's decision, the court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920. Only

3

if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920.

**Discussion**

Of particular concern to the undersigned is the ALJ's failure to follow the prior Order of this Court.  In our previous order, dated , the ALJ "directed to order a consultative pulmonary examination, to include PFT's" (pulmonary function tests).  He failed to do so.  In fact, the only mention of a pulmonary RFC assessment is the ALJ's statement that plaintiff's counsel had attempted but was unable to obtain such an assessment from plaintiff's treating doctor.  He made no mention of the court's directive.  The evidence in this case makes clear that plaintiff suffers from asthma which is aggravated by her state of morbid obesity.

Medical records indicate that plaintiff has been treated for exacerbations of her asthma on numerous occasions during the relevant time period.  On August 27, 2001, plaintiff was admitted to St. Joseph's Regional Health Center in Hot Springs, Arkansas, after a two-week history of increasing shortness of breath, cough, and fever.  (Tr. 191, 193).  She was hypoxic, with an oxygen saturation of eighty-nine percent on room air.  (Tr. 193).  Further, a chest x-ray revealed a right posterolateral infiltrate.  (Tr. 191).  Therefore, plaintiff was diagnosed with right lower lobe pneumonia, and admitted for intravenous antibiotics, updrafts, and pulmonary toilet.[1] (Tr. 191, 195).

---

[1]Respiratory toilet is the term used to describe techniques that help to clear pulmonary secretions, including frequent suctioning, chest percussions, coughing and deep breathing, inspirometer, and respiratory treatments utilizing bronchodilators.  (Tr. 191).

4

By September 13, 2001, plaintiff's pneumonia was noted to be resolved.  (Tr. 199).  She had good air exchange without wheezing.  However, Dr. R. Kyle Roper diagnosed her with restrictive airway disease and hypertension.  She was prescribed Advair and Singulair, and directed to continue updraft treatments and her hypertensive medication.  (Tr. 199).

On November 2, 2001, plaintiff presented to Dr. Bodemann's office with complaints of asthma exacerbation and fever.  (Tr. 245).  She indicated that these symptoms had been intermittent since her hospitalization for pneumonia in August.  Dr. Bodemann diagnosed her with asthma exacerbation and bronchitis.  He then gave her a Kenalog injection, samples of Levaquin, and prescriptions for Albuterol and Flovent inhalers, as well as Humibid LA.  (Tr. 246).

On November 10, 2001, plaintiff presented to the emergency room with complaints of worsening shortness of breath over the past two days.  (Tr. 203).  Audible diffuse expiratory wheezes were noted, although plaintiff had been taking Levaquin, Proventil, and using steroid inhalers.  (Tr. 203-204).  Chest x-rays were normal and clear, without effusion or infiltrate.  However, there was evidence of a possible early posterior infiltrate.  She was diagnosed with bronchospasm, status asthmaticus,[2] and hypertension.  (Tr. 204).  After intravenous therapy failed to remedy plaintiff's wheezing, Dr. Steve Bodemann decided to admit her for serial nebulizer treatments.  By November 16, 2001, treatment notes from Dr. Bodemann indicated that plaintiff had improved since her discharge from the hospital.  (Tr. 244).  However, she voiced

[2]Status asthmaticus is a medical emergency in which asthma symptoms are refractory to initial bronchodilator therapy in the emergency department.  *See* Constantine Saadeh, *Status Asthmaticus, at* emedicine.com.  Patients report chest tightness, rapidly progressive shortness of breath, dry cough, and wheezing.  *Id*.

5

concern over having to take steroids every three months to control her asthma exacerbations. Plaintiff also reported some palpitations, fluttering, and anxiousness while taking the steroids. Dr. Bodemann diagnosed her with stable asthmatic bronchitis, inadequately controlled hypertension, and mild anxiety/panic symptoms.  He then increased her Altace and Advair dosages. (Tr. 244).

On December 18, 2001, plaintiff complained of asthma exacerbation. (Tr. 242).  She had completed a Medrol Dosepack one week prior, and was on a maintenance therapy regimen of Singulair and Advair.  However, plaintiff expressed some concern over the fact that her exacerbation episodes had increased over the past several months.  She was also worried about the amount of Prednisone her condition required.  On examination, Dr. Andrew Grose noted inspiratory wheezes, but no crackles.  As such, he again prescribed Prednisone and directed her to continue the Altace to help control her blood pressure. (Tr. 243).  By December 24, 2001, plaintiff's breathing had improved. (Tr. 240).  Dr. Grose noted barely audible medium pitched wheezes at the base of her lungs on expiration.  Accordingly, he diagnosed her with asthma exacerbation, possibly made worse by the addition of Altace, and poorly controlled hypertension. He directed her to begin tapering off of the Prednisone, changed her to Advair Diskus, prescribed Tussionex for her cough, and increased her dosage of Norvasc. (Tr. 241).

On January 28, 2002, plaintiff presented to Dr. Bodemann's office with refractory asthma. (Tr. 234).  She had been trying to wean off steroids, but each time she tried to do so, her asthma returned "with a vengeance." On examination, plaintiff had audible wheezing bilaterally and very mild, generalized edema of the extremities. (Tr. 235).  She had recently stopped taking the Norvasc because it, in addition to the steroids, was causing her to have more peripheral

AO72A
(Rev. 8/82)

swelling.  Dr. Bodemann diagnosed her with refractory asthma and hypertension, he then prescribed a Prednisone pack, restarted her on Altace, and refilled her prescriptions of Advair, Singulair, and Albuterol inhalers.  (Tr. 235).

On February 7, 2002, Dr. Bodemann indicated that plaintiff was on a rather long Prednisone taper regimen. (Tr. 232). Plaintiff reported experiencing light headedness, difficulty relaxing and sleeping, and a slight headache.  She had recently stopped taking the Norvasc and Altace, because she ran out of both medications.  Plaintiff was referred to Dr. Agee, and directed to continue her current medications.  (Tr. 233).

On July 2, 2002, plaintiff reported dyspnea and wheezing, after tapering off of the Prednisone.  (Tr. 227).  Dr. Bodemann directed her to restart the Prednisone and continue checking her blood pressure at home.  (Tr. 227).  Then, on July 26, 2002, plaintiff reported increased wheezing, dyspnea, and cough, since discontinuing the steroids.  (Tr. 225).  She indicated that Tussionex did provide adequate relief, if she took it every night.  Her blood pressure reading was high, as she had been out of medication for one week.  (Tr. 226).  After diagnosing her with asthma exacerbation and hypertension, Dr. Bodemann gave her samples of Altace and again placed her on a Prednisone taper regimen.  (Tr. 226).

On October 22, 2002, plaintiff was coughing up thick greenish phlegm and wheezing. (Tr. 221).  Dr. Bodemann diagnosed her with asthmatic bronchitis.  (Tr. 222).  He then prescribed Levaquin, Guaifenesin, and Prednisone.  (Tr. 222).

On November 13, 2002, plaintiff saw Dr. Robert Johnson.  (Tr. 269).  He noted that she was in respiratory distress.  Plaintiff voiced her belief that being around perfumes and other similar things had worsened her condition.  She received her last steroid injection in October,

and was now unable to breath or lie down. On examination, Dr. Johnson noted diffuse wheezing with and without his stethoscope. (Tr. 270). Accordingly, he concluded that plaintiff should be admitted to the hospital for intravenous medication, updraft treatments, and antibiotics. (Tr. 265). Although there was no evidence of respiratory acidosis, plaintiff was noted to be in significant respiratory distress. (Tr. 268). The following day, plaintiff had improved. Although she still had some dyspnea on exertion, she had only mild wheezing. As such, plaintiff was discharged and directed to continue updraft treatments at home. (Tr. 265).

On January 14, 2003, Dr. Kim Agee wrote a letter indicating that plaintiff suffered from "significant asthma," necessitating the use of inhaled steroids, Singulair, and Albuterol. He noted that she had a significant degree of reactivity to triggers such as perfume and other strong odors. (Tr. 253).

On March 23, 2005, plaintiff was wheezing and coughing up yellow/green secretions. (Tr. 346, 350, 504). She had been taking Albuterol and Atrovent updrafts, but indicated she had never been in a $CO_2$ retainer. Dr. Garreth Carrick noted that plaintiff looked to be in really bad distress. He prescribed Levaquin and prescribed steroids. Dr. Carrick advised her to go straight to the hospital should her condition deteriorate. (Tr. 346, 350).

On April 5, 2005, Dr. Carrick noted that plaintiff was on "beaucoups of medication," including Pulmicort, Atrovent, Singulair, Prednisone, Altace, and Norvasc. (Tr. 345, 503). He stated that they he needed to continue all of these medications, as she was still coughing up a "little bit of junk." On examination, Dr. Carrick also noted wheezes all over, but less tightness than previously indicated. Accordingly, he increased her dosage of Pulmicort and prescribed a Z-pack. (Tr. 345).

8

On June 3, 2005, plaintiff was in dire straights.  (Tr. 338).  She was coughing and running a fever.  (Tr. 338).  Dr. Carrick also noted that he had been trying to get her to undergo bariatric surgery as her knees were shot and her asthma was bad.  He indicated that plaintiff was on steroids and had been followed for years with diets.  Dr. Carrick then placed her on Ketek to help with the infection.  She was told to go to the emergency room if her condition worsened.  (Tr. 338).

Plaintiff was hospitalized later that day, due to exacerbation of asthma and cellulitis of the right leg.  (Tr. 360-361, 442-478, 494).  A chest x-ray taken on this day showed probable lower lobe pneumonia.  (Tr. 357).  Plaintiff was then discharged on June 5, 2003.  However, plaintiff returned for hospitalization on June 7, 2005, for the same problem.  (Tr. 358-359, 414-438).  X-rays of plaintiff's chest taken on this date revealed a small amount of medial basal right lower lobe infiltrate/opacity similar to her June 3 exam.  (Tr. 356).  The radiologist noted that some of this could be chronic.  (Tr. 356).  Plaintiff was released home on June 9, 2005.  (Tr. 358).

On August 4, 2005, plaintiff's lung was hurting.  (Tr. 334, 490).  Records indicate that she had been prescribed Ketek and still had several doses remaining.  Her temperature was normal, and her cough was nonproductive.  Dr. Carrick noted that her asthma had been very good. Her lungs were clear to auscultation and percussion.  However, she had not heard anything about her bariatric surgery and Dr. Carrick was concerned that her knees were going to be destroyed.  Plaintiff was advised to finish off the Ketek, and to let him know if she was still feeling ill when the medication ran out.  (Tr. 334).

AO72A
(Rev. 8/82)

On August 8, 2005, plaintiff was experiencing chest congestion. (Tr. 488). Dr. Carrick could hear wheezes all over. As plaintiff was going on a vacation, Dr. Carrick prescribed Zithromax to alternate with Levaquin. (Tr. 488).

On February 3, 2006, Dr. Carrick indicated that plaintiff was in dire straits with her asthma. (Tr. 482). He stated that she had almost gone into respiratory failure at the hospital. Dr. Carrick also commented that plaintiff's weight was "very, very high." He noted that plaintiff was in a bind because her knees were "going." (Tr. 482).

This evidence makes clear that plaintiff experiences significant problems related to her asthma. There is, however, no evidence in the record to indicate the level of functioning of her lungs. Without this evidence, we cannot say that substantial evidence supports the ALJ's determination that plaintiff can work.

Also of significant concern is the ALJ's determination that plaintiff's morbid obesity has had no more than a minimal impact on her other impairments. (Tr. 369). Beginning in 2004, the record makes clear that plaintiff's obesity was exacerbating both her asthma and her degenerative knee condition. On October 21, 2004, plaintiff complained of back pain. (Tr. 353, 511). She was worried about the possibility of a blood clot in her leg. Dr. Carrick examined her and could not find a clot. He noted, however, that she was "huge," and still on Prednisone. Records indicate that she was waiting to apply for bariatric surgery. At this time, plaintiff's blood pressure was 138/88. Dr. Carrick prescribed Lorcet for her back pain and asked her to return in one month. (Tr. 353).

On November 4, 2004, plaintiff complained of pain in her left leg. (Tr. 351, 509). She indicated that it was a real problem. Dr. Carrick again noted that plaintiff needed bariatric

10

surgery.  However, plaintiff had recently change insurance carriers and needed to check with the carrier before proceeding.  Dr. Carrick increased her dosage of Norvasc.  (Tr. 351).

On April 20, 2005, plaintiff followed up with Dr. Carrick.  (Tr. 343, 499).  He noted that she was an asthmatic with very severe chronic obstructive pulmonary disease and sleep apnea. Dr. Carrick indicated that plaintiff was morbidly obese and had been trying to diet for at least the past year.  In spite of dieting, plaintiff had been unable to lose the excess weight.  He stated that her knees were being destroyed by her weight, and plaintiff was experiencing severe back pain, which was also related to her weight.  D. Carrick was of the opinion that plaintiff needed to undergo bariatric surgery to preserve her knees or else she would be in a wheelchair for life.  (Tr. 343).  He also ordered x-rays of her knees which revealed mild degenerative changes of the left knee with only slight degenerative changes of the right knee.  (Tr. 342, 501).

On May 4, 2005, Dr. Carrick indicated that plaintiff was "really, absolutely morbidly obese.  (Tr. 340, 497).  He stated that plaintiff was a severe asthmatic and, with that weight on her chest wall, it could cause "all kinds of trouble", so it was imperative that she undergo bariatric surgery.  Dr. Carrick also noted that recent x-rays of her knees had revealed degenerative changes in both knees, and opined that they would continue to degenerate.  (Tr. 340).

On May 27, 2005, Dr. Carrick wrote a letter indicating that plaintiff was suffering from extreme morbid obesity.  (Tr. 331, 496).  He stated that he had been treating her since November 2004 for chronic breathing difficulties associated with her asthma and obesity.  Dr. Carrick indicated that plaintiff was steroid dependent for her asthma treatment and had moderately severe sleep apnea, necessitating the use of a C-PAP machine.  He noted that she also suffered with

11

chronic back and knee pain, and that x-rays had shown narrowing and spurring of the bone in both knees from arthritis.    In addition, plaintiff was said to experience problems with hypertension, urinary incontinence, refractory reflux, lymphedema in both legs, and depression. Dr. Carrick was of the opinion that plaintiff's condition was serious and would not improve without significant weight loss.    He indicated that he had followed plaintiff with dietary counseling and a structured weight loss program for several months, but plaintiff had failed to achieve and maintain weight loss.    Her current weight was 400 pounds.    Because it was imperative that she get the weight off immediately, Dr. Carrick strongly advised her to pursue bariatric surgery.  (Tr. 331).

On January 6, 2006, plaintiff complained of pain in her right knee.  (Tr. 486).  She weighed 395 pounds and had been unable to lose any weight.  Dr. Carrick indicated that plaintiff's knees were gradually deteriorating and caused her a great deal of pain.  He stated that she would eventually become permanently crippled and in a wheelchair.  On examination, Dr. Carrick noted that plaintiff's knees were "huge" due to swelling.  (Tr. 486).

On January 23, 2006, plaintiff weighed 400 pounds.  (Tr. 484).  Her diet was not working, and she needed to lose more weight.  Dr. Carrick stated that the only thing that would help was bypass surgery.  However, her insurance refused to pay for it.  He also stated that plaintiff's knees were gradually becoming worse.  Plaintiff was coughing and running a low grade fever, so he prescribed Levaquin.  (Tr. 484).

On April 3, 2006, plaintiff was noted to have lost "a little bit of weight."  (Tr. 479). However, Dr. Carrick indicated that she was having a "very, very difficult time."  He also stated that her knees were just about gone, and her insurance company would not approve her to have

12

bariatric surgery.  He diagnosed her with asthma and severe arthritis of the knees.  (Tr. 479).

Clearly, plaintiff's obesity had more than a minimal impact on her other impairments.

After reviewing the entire record, it also appears that none of plaintiff's treating/examining physicians have completed an RFC assessment for the time period in question. *See Vaughn v. Heckler*, 741 F.2d 177, 179 (8th Cir. 1984.) (If a treating physician has not issued an opinion which can be adequately related to the disability standard, the ALJ is obligated to address a precise inquiry to the physician so as to clarify the record). The ALJ, in concluding that plaintiff could perform a full range of sedentary work, relied on an RFC assessment completed by a non-examining, medical consultant, in 2002. (Tr. 253-260).  Given the quantity of medical evidence concerning plaintiff's condition that was submitted after 2002, a more recent RFC assessment should have been obtained.  We also note that the opinion of a consulting physician who examined the plaintiff once or not at all does not constitute substantial evidence. *See Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999).  Therefore, based on the current evidence of record, we do not find substantial evidence supporting the ALJ's RFC determination.  The ALJ is hereby ordered to obtain an RFC assessment from plaintiff's treating doctor.

**Conclusion:**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and should be reversed and remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

13

DATED this 22nd day of July 2008.

/s/ J. Marschewski
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

14